810 F.2d 782
 Bankr. L. Rep. P 71,616
In Re: DOGPATCH U.S.A., INC., Debtor.
DOGPATCH PROPERTIES, INC., Appellant,
v.
DOGPATCH U.S.A., INC.; FirstSouth, Formerly Batesville
Federal Savings and Loan Association; Wynne
Federal Savings and Loan Association,
First Federal Savings & Loan Association of Stuttgart,
Arkansas, Appellee.
Arkansas Real Estate Commission.
Jess P. Odom and Willastein J. Odom.
 Nos. 86-1233 to 86-1236.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 25, 1986.
Decided Feb. 2, 1987.
 
 Ronald L. Boyer, Rogers, Ark., for appellant.
 Don F. Hamilton, Little Rock, Ark., for appellee.
 Before HEANEY, FAGG and BOWMAN, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 Dogpatch Properties, Inc., a purchaser of a bankruptcy debtor's property, and Jess and Willastein Odom, guarantors on the sale, appeal from judgments entered against them and the bankrupt, jointly and severally, for money owed to several banks on a sales contract. The sole question on appeal involves the jurisdiction of the bankruptcy court. For the reasons set forth below, we affirm.
 
 BACKGROUND
 
 2
 In 1974 and 1975, Dogpatch U.S.A., Inc. (the debtor) obtained five separate loans from three savings and loan institutions (collectively the S & Ls). The loans were evidenced by promissory notes signed by Jess P. Odom and Willastein J. Odom and secured by mortgages on real estate known as the Buffalo River Resort, consisting of a twenty-two unit hotel, a twelve unit motel, and sixteen chalet units.
 
 
 3
 By 1980, the debtor had defaulted on the loans and the S & Ls began foreclosure proceedings on the mortgages in state court. On November 3, 1980, Dogpatch U.S.A. filed a petition for reorganization under Chapter 11 of the bankruptcy code with the Bankruptcy Court of the Eastern District of Arkansas. The foreclosure proceedings in state court were automatically stayed pursuant to 11 U.S.C. Sec. 362.
 
 
 4
 On April 23, 1981, the S & Ls filed adversary proceedings in the bankruptcy court to obtain relief from the stay and/or adequate protection. Shortly thereafter, the debtor offered adequate protection through 1) a proposed sale of the Buffalo River Resort, subject to the S & Ls' first mortgage to Dogpatch Properties, Inc. (DPI), a separate legal entity; and 2) a guaranty agreement executed by the Odoms. Jess Odom was chief executive officer and principal stockholder of Dogpatch U.S.A. and would be the largest unsecured creditor if the plan of reorganization was approved. By order dated July 10, 1981, the bankruptcy court approved the sale subject to the S & Ls' mortgage liens. The approval was made contingent upon the execution of the guaranty agreement by the Odoms. The court found that the amount of the indebtedness owed on the properties exceeded their fair market value, but that the Odoms' guaranty would be the "indubitable equivalent" of the S & Ls' security interest in the property.
 
 
 5
 The sale was not closed as contemplated, but following renewed negotiations the parties reached a compromise agreement which was conditionally approved by the bankruptcy court on June 23, 1982. In that order the judge found the parties had agreed, inter alia, that Buffalo River Resort could be sold by the debtor to DPI,
 
 
 6
 subject, however at all times to [the Savings & Loan institutions'] first mortgage liens which liens are not to be impaired or subordinated and all conveyances of the motel/hotel apartments and/or chalet dwellings shall be subject to these first mortgage liens until such time when the indebtedness in connection therewith is paid in full.
 
 
 7
 On August 5, 1982, a contract for the sale of the property, consistent with the agreement, was executed for the sum of $1,613,000. The contract acknowledged that the property would be sold on a time share basis.
 
 
 8
 The time shares were to be sold on a seven year ten percent monthly reduction basis generating approximate monthly payments of $1,600 per $100,000 worth of time share contracts. DPI was to make monthly payments to the S & Ls by pledging and assigning the time share contracts to the S & Ls, including DPI's rights to payment thereunder. The amount of the monthly payments was thus dependent on the value of the time shares DPI assigned to the S & Ls. The contract specified that DPI would assign to the S & Ls "the greater in value of Time Shares worth $35,000.00 or twenty percent (20%) of all Time Shares sold during that month[.]" The agreement also contemplated that in some months, DPI would not sell the minimum $35,000 worth of time shares required to be assigned. In this case, the contract called for DPI to pay the S & Ls the cash equivalent of the proceeds that would be generated by $35,000 worth of Time Shares. In any event, the cash payment in any given month was not to be less than $560.
 
 
 9
 On February 11, 1983, the bankruptcy court conditionally confirmed the debtor's proposed chapter 11 plan of reorganization, based on payments being made on the contract. Confirmation of the plan was subject to the following pertinent conditions:
 
 
 10
 (1) The discharge of the debtor shall be withheld until full confirmation of the plan of reorganization; and
 
 
 11
 (2) The bankruptcy court shall retain jurisdiction for all purposes until full consummation of the plan of reorganization; and
 
 
 12
 (3) The transferee entity of the debtor's real property, Dogpatch Properties, Inc. shall be regarded as within the jurisdiction of this Court as fully as if it were the Chapter 11 debtor until full consummation of the reorganization plan.
 
 
 13
 Several time share sales were made after confirmation.
 
 
 14
 In June of 1983, The Arkansas Time Share Act, Ark.Stat.Ann. Secs. 50-1301--50-1338, became effective vesting the Arkansas Real Estate Commission with the authority to enforce the Act. Section 50-1321 of the Act required that prior to the transfer of time share intervals, the developer shall record or furnish to the purchaser releases of all liens affecting the time share interval or provide a surety bond or insurance against the lien from a company acceptable to the agency. DPI was forced to halt its time share sales as a result of the newly passed legislation. DPI sought but was unable to obtain relief from the S & Ls or the Arkansas Real Estate Commission.
 
 
 15
 DPI filed an adversary proceeding against the Arkansas Real Estate Commission, the S & Ls, and Dogpatch USA, Inc., on August 5, 1983. It asked the bankruptcy court to hold that the Arkansas Time Share Act was not applicable to DPI's Buffalo River Resort time share project. The S & Ls filed a counterclaim against DPI asserting that DPI had breached the contract by failing to make the required monthly payments. They also filed a third-party complaint against the Odoms alleging that DPI was in default and requesting immediate judgment on the Odoms guaranty, and they filed a cross-claim against Dogpatch, U.S.A.
 
 
 16
 On February 27, 1984, the court held that the time share act was not applicable to DPI's Buffalo River Resort Project. However, it required DPI to give specific written notice to purchasers that the S & Ls' continued to have a first lien on the purchased time shares until such time as the S & Ls' mortgages were paid in full. Time share sales immediately declined. Thereafter, extensive negotiations between DPI, the S & Ls, and the Odoms took place. The goal of the negotiations was to arrive at a lump sum settlement that the S & Ls would be willing to accept in exchange for release of their liens. The negotiations, however, proved unsuccessful.
 
 
 17
 In September of 1984, the S & Ls gave notice of default for lack of payment under the contract, no payments having been made since early 1983.
 
 
 18
 In February of 1985, the bankruptcy court took under consideration the question of whether it had jurisdiction over the S & Ls' counterclaim, cross-claim, and third party complaint. It held: the cross-complaint against the debtor, involving the issue of the debtor's liability for the indebtedness secured by the liens of the savings and loan institutions, was a core proceeding in which it could enter final orders. It determined, however, that the counterclaims against DPI and the third party complaint against the Odoms were non-core proceedings related to the chapter 11 proceeding pending in bankruptcy court. It certified these matters to the district court. The district court immediately remanded the matter to the bankruptcy court for recommendations. In the interest of uniformity and efficiency of administration, the bankruptcy court decided to propose findings and conclusions on the three issues together.
 
 
 19
 On October 3, 1985, the bankruptcy court held:
 
 
 20
 1) the S & Ls' are third-party beneficiaries to the contract between DPI and Dogpatch U.S.A. and can enforce the provisions of the contract in the action before the court;
 
 
 21
 2) the contract specifically provides that the entire indebtedness to the S & Ls is to be paid prior to the release of the liens held by them on the Buffalo River Resort.
 
 
 22
 3) the Odoms remained liable under their guaranty; and
 
 
 23
 4) DPI and Dogpatch U.S.A. are in default[1] under the terms of the Dogpatch contract and thus the S & Ls are entitled to judgment against Dogpatch U.S.A., DPI, and the Odoms jointly and severally.[2]
 
 
 24
 The district court accepted the recommendation of the bankruptcy court and entered judgment pursuant to its findings of fact and conclusions of law. This appeal by the Odoms and DPI followed.
 
 ANALYSIS
 
 25
 A good argument can be made that DPI and the Odoms consented to the jurisdiction of the bankruptcy court.[3] An equally strong argument can be made that even if the parties had not specifically consented to the jurisdiction of the bankruptcy court that this was a core proceeding over which the bankruptcy court had jurisdiction. The Buffalo River Resort was the principal asset of the bankruptcy estate and its value was less than the indebtedness of Dogpatch U.S.A. to the S & Ls. The bankruptcy court made it clear at the outset that it would dismiss the petition for reorganization unless the Odoms personally guaranteed the debts secured by the mortgages on the resort. Moreover, it is clear that the plan of reorganization would not have been approved unless the contract between Dogpatch U.S.A. and DPI was included as a part of the reorganization. Under these circumstances, the appellees' claims can be fairly characterized as core proceedings pursuant to 28 U.S.C. Sec. 157(b)(2). Without the contract and the guaranty, there would have been no reorganization. We need not rely, however, on either the consent to jurisdiction or jurisdiction under core proceeding because the bankruptcy court properly held that the S & Ls' counterclaim against DPI and third-party claim against the Odoms were related to a case under chapter 11 and thus were within the jurisdiction of the bankruptcy court.
 
 
 26
 For a proceeding to be "related to" a bankruptcy case for purposes of bankruptcy jurisdiction, courts require that it "have some effect on the administration of the debtor's estate." Zweygardt v. Colorado Nat'l Bank, 52 B.R. 229, 233 (D.Colo.1985). As the Third Circuit recently stated:
 
 
 27
 [T]he test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy * * *. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action * * * and which in any way impacts upon the handling and administration of the bankrupt estate.
 
 
 28
 Pacor v. Higgins, 743 F.2d 984, 994 (3rd Cir.1984) (emphasis included). See National City Bank v. Coopers and Lybrand, 802 F.2d 990 (8th Cir.1986).
 
 
 29
 Here, not only would the outcome of a civil proceeding to foreclose and collect on the guaranty have an effect on the estate, it would be determinative of the rights of the parties.
 
 
 30
 Under the Dogpatch contract, the debtor remained liable to the S & Ls in the event that DPI defaulted on the contract. In this action brought by the S & Ls on the Dogpatch contract, the S & Ls sought and obtained judgments against DPI, the debtor, and the Odoms jointly and severally. Thus, these actions against the Odoms and DPI certainly would have a real and tangible effect on the estate of the debtor. If DPI can't pay, the debtor will be responsible for the liens, the money will come out of the debtor's estate, and unsecured creditors will get nothing. See Showcase Natural Casing Co. v. Novachich, 54 B.R. 142 (S.D.Ohio 1985).
 
 
 31
 Accordingly, we affirm the judgments of the bankruptcy court and the district court for the reasons more fully set forth in the opinions of the bankruptcy court and the district court.
 
 
 
 [1]
 The appellants contended during trial that the parties had arrived at a settlement agreement during the course of negotiations. The bankruptcy court had found that no such settlement had been arrived at. This finding was adopted by the district court and is not clearly erroneous
 
 
 [2]
 The court awarded FirstSouth $527,000; Wynne Federal $375,000, and $532,000 for First Federal, plus attorneys' fees and interest in each instance as of April 30, 1985
 
 
 [3]
 Paragraph 14 of the Dogpatch contract specifically referred to the "continuing jurisdiction" of the bankruptcy court and provided, as follows:
 
 
 [14]
 JURISDICTION OF BANKRUPTCY COURT. The parties hereto acknowledge the continuing jurisdiction of the Court by virtue of the Court's order dated June 23, 1982, ("the Order") in the pending proceeding in the United States Bankruptcy Court, Eastern District of Arkansas, Western Division, In re: Dogpatch U.S.A., Inc., Debtor in Possession, Adversary Proceedings No. 81-286 and 81-287; and, in the event that there are any conflicting provisions of the Order and the contents of the Agreement, the Order shall govern
 The Dogpatch contract and the guaranty essentially became the basis of the Reorganization Plan and provided certain rights and liabilities of the parties. Judge Stewart's order, dated February 11, 1983, conditionally approving the reorganization plan provided, inter alia, as follows:
 (2) the bankruptcy court shall retain jurisdiction for all purposes until full consummation of the confirmed plan of reorganization; and
 (3) the transferee entity of the debtor's real property, Dogpatch Properties, Inc., shall be regarded as within the jurisdiction of this Court as fully as if it were the Chapter 11 debtor, until full consummation of the confirmed plan of reorganization[.]